LINCOLN NAT. LIFE INS. CO. v. ERICKSON.

No. 8847.

Circuit Court of Appeals, Eighth Circuit.

Aug. 9, 1930.

998

Herbert G. Nilles, of Fargo, N. D. (Daniel B. Holt and John S. Frame, both of Fargo, N. D., C. G. Dosland, of Moorhead, Minn., and R. F. Baird, of Ft. Wayne, Ind., on the brief), for appellant.

Charles Loring, of Crookston, Minn., and Julius J. Olson, of Warren, Minn. (Oscar R. Knutson, of Warren, Minn., and John H. Hougen, of Crookston, Minn., on the brief), for appellee.

Before KENYON, BOOTH, and GARDNER, Circuit Judges.

BOOTH, Circuit Judge.

This is an appeal from a judgment after verdict in favor of plaintiff-appellee in a suit on a life insurance policy containing a double indemnity provision. The action was begun in the state district court and thereafter removed to the federal court on the ground of diversity of citizenship.

The policy was for $10,000, with a double indemnity clause which read as follows: "It is Hereby Agreed That if Magnus Erickson, the insured under the above numbered Policy shall, during the premium paying period of the Policy and while no premium is in de- fault, sustain bodily injury, effected directly through external, violent and accidental means, (suicide, sane or insane, or any attempt thereat, sane or insane, not included) exclusively and independently of all other causes, which shall within ninety (90) days of the event causing the accident, result in the Death of the Insured * * * The Company in case of such accidental death will pay to the Beneficiary or Beneficiaries hereunder upon surrender of the said Policy and this Double Indemnity Benefit Double The Face Of The Policy, making the total amount payable Twenty Thousand Dollars."

The policy also contained the following condition governing the double indemnity benefit: "This Double Indemnity Benefit does not cover death * * resulting directly or indirectly from disease in any form."

The complaint alleged that plaintiff was sole beneficiary under the policy; that on or about the 23d of November, 1928, "said Magnus Erickson [husband of appellee], through external, violent and accidental means, unexpectedly and accidentally received a physical injury causing an abrasion in the skin of his face; that as a result of said abrasion a streptococcic infection started in the face of said Magnus Erickson and spread throughout his system and as a result thereof he became infected therewith and died therefrom on said 30th day of November, 1928; that said infection and the death of said Magnus Erickson were directly and proximately due to said accidental abrasion of his skin and that said death was due to a cause insured against by defendant under said 'Double Indemnity Benefit' agreement and was the result of an accident sustained and effected directly through external, violent and accidental means, exclusively and independently of all other causes, and that said Magnus Erickson died within ninety days of the event causing said accident."

The defendant company, the appellant, prior to the bringing of the action, paid $10,000, the face amount of the policy, without prejudice to the rights of the beneficiary, but refused to pay anything under the double indemnity clause, denying its liability thereunder.

On the trial, at the close of plaintiff's evidence, defendant moved for a directed verdict, on the ground of failure of proof. The motion was denied, and defendant excepted. Defendant introduced no evidence. The case was submitted to the jury on plaintiff's evidence, and a verdict was returned in her favor.

The evidence tended to show the following facts: The deceased was a resident of Oslo, Minn., was manager of the Oslo Mercantile Company, and also interested in farming. On Friday morning, November 23, 1928, he went to his store, and later in the forenoon his wife drove in an automobile to the store, picked him up, and they drove to her father's farm in North Dakota, about 2½ miles distant. After an early dinner, plaintiff's father, Mr. Ferguson, and the deceased, drove to Forest River. On the way they stopped at Ardock. The deceased went into a barber shop at that place and remained there about a half hour. Mr. Ferguson did not go in. The deceased came out and the two went on to Forest River and transacted business there, and at several other places; and then returned to the home of Mr. Ferguson, where they had supper. Mr. Ferguson did not observe whether deceased had been shaved. Plaintiff did observe that deceased had been shaved. After supper, plaintiff and deceased drove back to the store at Oslo. They both went in. The deceased talked with one of his associates, Pearson, and in the course of the talk called attention to what appeared to be a small cut on the chin of the deceased. Plaintiff returned home, and deceased returned later. Next morning, Saturday, at breakfast, plaintiff observed that the chin of deceased on the right side was inflamed underneath, like a little pimple, and that there was a small cut in the skin. The deceased went to his store at the usual hour in the morning, complained of not feeling well at lunch time, and did not go to lunch but returned home in the afternoon. Plaintiff, on returning home about the middle of the afternoon, found deceased in bed. He complained of not feeling well. She gave him an alcohol bath and called Dr. Wiltrout, who lived next door. Dr. Wiltrout was a regularly licensed physician of 17 years' experience. He was the family doctor of deceased. He examined deceased about 4:30 p. m. Saturday and found his pulse 100, temperature 102. He also found a small raised inflamed area on the middle chin. He prescribed as a local application for the chin an ointment for superficial condition; systematic treatment was also prescribed. The doctor also discovered that deceased had a mild bronchitis; and the temperature, chills, and muscular pains were thought by him to indicate influenza.

Visits to the deceased were made by Dr. Wiltrout on the 25th and the 26th, and the same treatment was continued. The pulse and temperature continued high and the inflamed area on the chin gradually enlarged.

On the 27th Dr. Edward Bratrud was called in consultation. Change was made in the treatment. Hot packs were applied to the chin, and the systematic treatment was altered. The infected area continued to enlarge. A microscopic examination of a smear taken showed streptococci present. Antistreptococcic serum was given intermuscularly. A count of the white corpuscles showed 12,000. The patient grew progressively worse. Late on the 29th, Drs. Blegen and Hetherington were called in consultation. Another count of the white corpuscles showed 6,000. On the forenoon of the 30th the patient died.

Dr. Wiltrout testified that in his opinion the bronchitis and the influenza spoken of did not contribute in any way to the death of deceased. On cross-examination he admitted that he had signed a death certificate in which he named influenza as a contributing cause of the death; and on recross-examination he testified as follows:

"Q. But your diagnosis then, Doctor, at the time you signed the death certificate, influenza was a contributing cause? A. Yes, sir.

"Q. And you so stated? A. Yes, sir.

"Q. And you now state that it was not a contributing cause? A. Yes, sir.

"Q. Then it was a question of doubt? A. Yes, sir, it was at the time I signed the certificate.

"Q. And it is still a question of doubt? A. Yes, sir.

"Q. It is a debatable question? A. Yes, sir, debatable question."

Dr. Edward Bratrud testified that when he called on the deceased on November 27th he found a typical streptococcus cellulitis of the lower lip and chin on the right side. There was a small abrasion on the chin.

Dr. Blegen testified over objection that when he called on the deceased on the night of November 29th he found him suffering from septicæmia due to streptococcic infection.

Dr. Theodor Bratrud, called as an expert, testified over objection that in his opinion, based upon the evidence given on the trial and assuming it to be true, the death of deceased was caused solely by streptococcic infection, and that the streptococcus entered through the abrasion on the chin.

Dr. O. Th. Sherping, called as an expert, testified to the same effect. Questioned further as to the cause of the death of deceased he answered over objection that in his opin-

ion it came "from accidental infection of streptococcus." Motion to strike out this answer was denied.

On the foregoing facts the appellant contends that a case was not made out within the terms of the policy; and the appellee contends to the contrary.

■ An analysis of the provision above quoted from the policy shows that it covers a death caused by a bodily injury. The bodily injury must be one effected in a particular way; namely, directly through external means, and directly through violent means, and directly through accidental means. The bodily injury must be the exclusive cause of death independently of all other causes, and the death must occur within ninety days of the date of the accident.

■ The burden of proof was upon the plaintiff to show that the death resulted from a bodily injury exclusively and independently of all other causes, and that the bodily injury was effected directly through external, violent, and accidental means. Travelers' Ins. Co. v. McConkey, 127 U. S. 661, 8 S. Ct. 1360, 32 L. Ed. 308; National Masonic Ass'n v. Shryock, 73 F. 774 (C. C. A. 8); Aetna Life Ins. Co. v. Vandecar, 86 F. 282 (C. C. A. 8); National Ass'n Ry. Clerks v. Scott (C. C. A.) 155 F. 92; Aetna Life Ins. Co. v. Ryan (C. C. A.) 255 F. 483; Order of United Coml. Travelers v. Nicholson (C. C. A.) 9 F.(2d) 7; Mutual Life Ins. Co. v. Hatten, 17 F.(2d) 889 (C. C. A. 8).

Plaintiff, accordingly, sought to prove by circumstances and inferences that the abrasion of the skin on deceased's chin was accidentally caused in the barber shop at Ardock, and that the abrasion was accidentally infected at that time, and that the infection and death were caused by the abrasion.

■ There was proof of death. There was also proof of a bodily injury, considering the abrasion of the skin on the chin to be the bodily injury. The nature of an abrasion, of course, is such that it may be said that it is necessarily brought about by external means, and by violent means; violence in the sense used in this policy and other similar policies means any degree of force whatever.

There was no direct proof, however, how, where, when, or under what circumstances the abrasion was produced, and no proof whatever of any accidental means producing the abrasion. The abrasion may have been intentionally produced and with means expressly selected for the purpose. And there was no proof that the bodily injury, namely, the abrasion, caused the death. The death, ac-

cording to the medical testimony, was caused by the streptococcic infection in the blood. The abrasion, of course, did not create or produce the streptococci, nor cause them to enter the blood; at most it afforded an opportunity for them to enter. So far as the evidence shows, the streptococci may have entered the blood at the time the abrasion was made or some time after the abrasion was made.

■ And at this point it may be proper to note the distinction between an accidental result and the result of an accidental cause or means. Under policies worded as the one in the present case the element of accident must be found to exist in that which produces the bodily injury, i. e., in the means or cause rather than in the result. The distinction is important and is recognized in many well-considered cases.

In United States Mutual Acc. Ass'n v. Barry, 131 U. S. 100, page 121, 9 S. Ct. 755, 759, 33 L. Ed. 60, the court said: " * * * if in the act which precedes the injury something unforeseen, unexpected, unusual, occurs, which produces the injury, then the injury has resulted through accidental means."

In Pope v. Prudential Ins. Co. (C. C. A.) 29 F.(2d) 185, page 186, the court said: "There is no occasion to deny that a death, so resulting, may be in a very proper sense an accidental death; but there is obviously a substantial distinction between an accidental result and the result of an accidental cause. We think it not only to be the natural meaning of the words, as they would be understood by the ordinary policyholder, but the right construction thereof, supported by the weight of authority, that when the insured or those acting with his consent did precisely what they intended to do and in the way which they intended, knowing that injury often did result and might be unavoidable, and where there was no slip or misstep in the performance, and where there was no ignorance of any material factor, this conduct cannot be said to have been the accidental cause of the injury which unfortunately may follow."

In Shanberg v. Fidelity & Cas. Co., 158 F. 1, pages 4, 5, 19 L. R. A. (N. S.) 1206, this court said: "The policy is one of indemnity against disability or death, resulting directly, and independently of all other causes, from bodily injuries sustained through external, violent, and accidental means, and also against disability from certain illnesses therein specified. The disease from which the assured was suffering at the time of his death was not enumerated in the policy, and, as we view the case, there was no accident in the

means through which the bodily injury was effected. It would not help the matter to call the injury itself—that is, the rupture of the heart—an accident. That was the result, and not the means through which it was effected. Carrying the door, or, after putting it down, the act of filling his lungs with air by drawing a long breath, was the means by which the injury was caused."

In Kimball v. Mass. Acc. Co., 44 R. I. 264, 117 A. 228, 230, 24 A. L. R. 726, 729, which involved a policy similar to the one in the case at bar, the court said: "* * * However unexpected the result might be, no recovery could be allowed under such a provision unless there was something unexpected in the cause or means which produced the result." See, also, Maryland Cas. Co. v. Spitz (C. C. A.) 246 F. 817, L. R. A. 1918C, 1191; Olinsky v. Ry. Mail Ass'n, 182 Cal. 669, 189 P. 835, 14 A. L. R. 784; Ogilvie v. Aetna Ins. Co., 189 Cal. 406, 209 P. 26, 26 A. L. R. 116; Smith v. Travelers' Ins. Co., 219 Mass. 147, 106 N. E. 607, L. R. A. 1915B, 872; Stone v. Fid. & Cas. Co. of N. Y., 133 Tenn. 672, 182 S. W. 252, L. R. A. 1916D, 536, Ann. Cas. 1917A, 86.

In the case at bar the deceased was insured, not against accidental results of intended means, but against death resulting from a bodily injury effected directly through external, violent, and *accidental means*. It may be proper enough, loosely to speak of the death as an accidental one; but the evidence, in our judgment, fails to show a death resulting from a bodily injury effected directly by accidental means.

The weakness in the case at bar, however, lies not merely in the failure to show bodily injury effected directly by accidental means. There is failure of proof in other respects.

First, the contention of counsel for appellee that the facts disclosed by the evidence bring the case within the coverage of the policy assumes that the bodily injury specified in the policy includes both the abrasion of the skin on the chin of deceased and the streptococcic infection. In their brief counsel say: " 'Bodily injury' refers not only to the cut or nick upon the insured's chin but to the entire cause of death. The cause of death necessarily includes the cut itself as well as the blood poisoning following the same. The 'cut' and subsequent blood poisoning both together constitute the 'bodily injury' and are the 'means' that brought about the death of the insured."

This statement, we think, involves a wrong construction of the policy. In con-

struing a policy of insurance, as in construing any other contract, the words used are to be given their usual ordinary meaning, unless a contrary intention appears from the contract itself or from surrounding circumstances. In the case of St. Paul F. & M. Ins. Co. v. Ruddy, 299 F. 189, page 193, this court, speaking by Judge Kenyon, said: "The question here is one of contract. Insurance contracts are construed, like other contracts, according to the ordinary sense and meaning of the terms employed, and if they are clear and unambiguous their terms are to be taken in the plain, ordinary, and popular sense."

It is true there are cases which hold that an infection of a cut or an abrasion which follows directly such cut or abrasion may, under the wording of the particular policy involved, be considered as a bodily injury. See Moore v. Fidelity & C. Co., 203 Cal. 465, 265 P. 207, 56 A. L. R. 860; Hornby v. State Life Ins. Co., 106 Neb. 575, 184 N. W. 84, 18 A. L. R. 106; Cary v. Preferred Acc. Ins. Co., 127 Wis. 67, 106 N. W. 1055, 5 L. R. A. (N. S.) 926, 115 Am. St. Rep. 997, 7 Ann. Cas. 484.

But in the case at bar the provision above quoted from the policy that the double indemnity benefit "does not cover death * * * resulting directly or indirectly from disease in any form" draws a clear distinction between "bodily injury" and "disease." The former is covered by the double indemnity clause; the latter is not. The distinction thus drawn is not a strained one, but is such as the common usage of the words conveyed and such as would occur to the mind of the ordinary layman. It may be that there is no scientific basis for classifying a bruised finger as a bodily injury, and tuberculosis as a disease. The ordinary man, however, makes the distinction in his everyday language. And so, in construing this contract of insurance, we are not concerned with scientific definitions, but with the ordinary meaning of common words.

We find nothing in the policy or in the surrounding circumstances to indicate that the words "bodily injury" were intended to include streptococcic infection; and the provision above quoted as to "disease" would seem to indicate that the term "bodily injury" was not intended to be given an unusually broad or a technical meaning.

Second, the contention of appellee cannot be sustained because it involves a series of presumptions based one upon another. That the abrasion on the skin of the chin of

deceased was received in the barber shop is a mere presumption. The evidence does not show that the abrasion did not exist when deceased went into the barber shop, nor does the evidence show that the abrasion did exist at the time when deceased came out of the barber shop. There is no proof that deceased was shaved while in the barber shop. Mr. Ferguson did not observe that deceased had been shaved when he came out of the barber shop, nor did he notice any abrasion on deceased's chin. Plaintiff observed some hours later that deceased had been shaved, but when or where the evidence does not disclose.

A second presumption based upon the first is that the abrasion was accidentally caused. There is no proof to that effect; and this is not a case in which a presumption of accidental means can be indulged as is frequently done in cases where a person is found dead from asphyxiation, drowning, or shooting. It is just as possible in the case at bar that deceased himself intentionally opened a pimple on his chin, either at home or in the barber shop, or that he directed the barber so to do, as that the abrasion was accidentally caused.

A third presumption based upon the others is that the abrasion was produced in the barber shop by some instrument infected with streptococci, and that in this way the streptococci were then and there introduced into the blood. There is no evidence that this was the case. So far as the record shows, the streptococci may have entered the blood through the abrasion at an earlier time or at a later time; and at a different place and in a different manner. It seems just as probable that the abrasion was caused by an uninfected instrument and that the streptococci were later introduced by wiping the abrasion with an infected handkerchief.

A fourth presumption is that when deceased entered the barber shop he was free from streptococcic infection. As above stated, the evidence does not disclose whether the abrasion or perhaps a malignant pustule existed before deceased entered the barber shop; and the evidence does not advise us of the habits or the habitat of the streptococcus.

■ It is to be noted that neither the barber nor any one else who may have been in the barber shop was produced as a witness, nor was their absence accounted for so far as the record shows. The burden of proof was upon the plaintiff, and failure to produce a witness such as the barber leads to a presumption that, if produced, his testimony would have been unfavorable to plaintiff. 10 R. C. L. 884 et seq.; Gulf, etc., Ry. Co. v. Ellis, 54 F. 481 (C. C. A. 8); Hill v. United States, 234 F. 39 (C. C. A. 8); Malouff v. Pope, 9 F.(2d) 254 (C. C. A. 8).

■ The result is that plaintiff's case is built upon presumptions based one upon another. Such a course of procedure is not allowable, either in a civil or criminal case. 22 C. J. p. 84, § 27; 9 Encyc. of Evid. p. 880; Brady v. United States, 24 F.(2d) 399, 404 (C. C. A. 8); General Reins. Corp. v. Southern Sur. Co., 27 F.(2d) 265, 272 (C. C. A. 8), and cases cited.

Without aid from such inadmissible presumptions, the evidence fails to bring the case within the coverage of the policy.

While the authorities are not entirely uniform, yet the conclusions above reached are in our opinion, in accord with many well-considered cases. Herdic v. Maryland Cas. Co. (C. C.) 146 F. 396; Id. (C. C. A.) 149 F. 198; Shanberg v. Fidelity & Cas. Co., supra; Maryland Cas. Co. v. Spitz, supra; Pope v. Prudential Ins. Co., supra; Carnes v. Iowa Traveling Men's Ass'n, 106 Iowa, 281, 76 N. W. 683, 68 Am. St. Rep. 306; Smith v. Travelers' Ins. Co., 219 Mass. 147, 106 N. E. 607, L. R. A. 1915B, 872; Caldwell v. Travelers' Ins. Co., 305 Mo. 619, 267 S. W. 907, 39 A. L. R. 56; Kendall v. Trav. Ass'n, 87 Or. 179, 169 P. 751; Ramsey v. Fidelity Co., 143 Tenn. 42, 223 S. W. 841, 13 A. L. R. 651.

Many of the cases seemingly in conflict may be distinguished, either because the evidence disclosed the exact cause of the bodily injury and the circumstances, together with the time, place, and circumstances of the infection, or because the wording of the policy was materially different. Of such character are the cases: Western Commercial Ass'n v. Smith, 85 F. 401, 40 L. R. A. 653 (C. C. A. 8); Interstate, etc., Ass'n v. Lewis, 257 F. 241 (C. C. A. 8); Iowa Trav. Men's Ass'n v. Lewis, 257 F. 552 (C. C. A. 8); Business Men's Acc. Ass'n v. Schiefelbusch, 262 F. 354 (C. C. A. 8); Aetna Life Ins. Co. v. Brand (C. C. A.) 265 F. 6, 13 A. L. R. 657; Continental Cas. Co. v. Willis (C. C. A.) 28 F.(2d) 707, 61 A. L. R. 1069.

Various other questions are raised by the assignments of error; but we pretermit discussion of them as they are not likely to occur on another trial, and as the foregoing disposes of this appeal. We think it was error to deny the motion of defendant for a directed verdict. Judgment is accordingly reversed, with directions to grant a new trial.